Hillsborough, }
  Dec., 1895. }

SMITH & a., *Trustees, v.* NEW HAMPSHIRE TRUST CO. & a.

When pledgors of real estate securities with trustees for bondholders are, by the terms of the pledge, to have the management and collection of the pledged securities until it appears that the interests of the trust require that other agencies be employed, a promise to pay the pledgors for services so rendered will not be implied.

A provision that "all collections of principal on mortgages, all sums realized on sales of any property then in this trust, all rents, income, and interest in excess of the amount required to pay the interest on the outstanding obligations, sums paid as taxes, and actual expenses of administering this trust shall be paid over to the trustees," does not authorize the pledgors to retain any of the principal for compensation, or for interest or taxes paid by them.

Such agreement is a pledge of the principal and the net income,— and the stipulation that any part of the income used by the pledgors for taxes or expenses shall be paid to the trustees before the pledgors make dividends to stockholders, requires that the gross income be paid to the trustees before dividends can be declared.

BILL IN EQUITY, praying for advice in the execution of a trust. Facts agreed. March 14, 1894, the New Hampshire Trust Company and the plaintiffs made an agreement which, after stating that the company proposed to issue its obligations and secure the payment of them by a deposit of certain property with the plaintiffs in trust, contained the following, in substance, among other provisions : 1. The obligations to be issued shall become due January 1, 1904, and bear interest at the rate of four per cent per annum until October 1, 1897, and at the rate of five per cent per annum after that date, payable semi-annually, beginning July 1, 1894. 2. The company shall deposit with the plaintiffs titles to real estate, notes secured by mortgages of real estate, or other securities based on real estate, then or formerly in the custody of prior trustees, or any other securities that shall be satisfactory to the plaintiffs; and the plaintiffs shall certify upon obligations of the company equal in amount to the appraised value of the securities so deposited, that the holders of them are entitled to participate in the benefits secured by the agreement. 3. The plaintiffs shall have full control of the properties then or thereafter in the trust, including the collection of principal and interest of notes, provided, however, that they shall " effect such collections and manage such properties through the medium of the officers, agents, and employees of the company, unless it shall

appear that the interests of the trust property require that other agencies be employed." 4. "In the carrying out of the intent of the preceding section, the trustees [plaintiffs] may allow the company to withdraw from their hands from time to time, for collection, suit, or foreclosure, notes, mortgages, or other evidences of debt, and may accept the receipt of the company therefor, and all that is collected, realized, or acquired by means of securities and evidences of debt thus withdrawn, shall be put back into and become again a part of the security under this trust." 5. "It is agreed that all collections of principal on mortgages, all sums realized on sales of any property then in this trust, all rents, income, and interest in excess of the amount required to pay the interest on the outstanding obligations under this or former trusts, sums paid as taxes, and actual expenses of administering this trust, shall be paid over to the trustees [plaintiffs] from time to time as the same is received, and the funds thus received may be applied from time to time to the purchase of obligations issued hereunder whenever such obligations can be purchased at such a discount from their face value as shall be satisfactory to the trustees [plaintiffs]; or to the purchase of other existing secured obligations of the company, whenever such obligations can be purchased at such a discount from their face value as shall be satisfactory to the trustees [plaintiffs]; it being the intent of the parties hereto that purchases of securities as above provided shall be made whenever it shall appear to the trustees [plaintiffs] to be for the interest of the trust property; otherwise, such funds shall be distributed *pro rata* to all holders of the outstanding obligations issued hereunder. Whenever any existing secured obligations of the company under this or existing trusts are purchased as above provided, said obligations or the security therefor shall become a part of the trust property. And whenever purchase of any of the bonds secured by this trust or of existing obligations shall be so made at less than the face value thereof out of the proceeds of property pledged hereunder, no excess of security thereby created shall be withdrawn from the hands of the trustees [plaintiffs], but shall remain in this trust as additional security for the outstanding bonds; and if any part of the income or interest is required to pay the expenses of administering this trust and taxes as aforesaid, the full amount of the same shall be paid over to said trustees [plaintiffs] before any dividend, either of profits or assets, shall be made or paid to the stockholders of said company." 6. No default in the payment of principal or interest shall be deemed to have occurred until the expiration of five months after the same shall become due, and no right of action against the company shall previously accrue without its consent. Whenever a default so occurs, the plaintiffs, at the request of the holders of the major

part of the outstanding obligations, shall collect the securities in their possession or sell them at public auction as directed by such holders, and shall pay the proceeds *pro rata* upon the outstanding obligations; or, if such holders shall so elect, the trust shall terminate and they shall assume control of the securities for the benefit of the holders of the obligations. 7. The company shall pay the trustees reasonable compensation for their services and the necessary expenses incurred by them, and they are authorized to employ at the expense of the company a sufficient clerical force to properly execute the trust; "and the compensation of said trustees together with their other legitimate expenses shall be a first lien upon the securities remaining in their hands, and shall be deemed to be a part of the expenses of administering this trust, to be paid out of the collections realized from the trust property in accordance with the provisions of section numbered five." If the trustees shall be required to collect or sell the securities after a default, as provided in section 6, "they shall be entitled . . . to pay the necessary costs and charges of the collection or sale of such securities out of the money so realized by them before making any distribution."

Other facts appear in the opinion.

*Isaac W. Smith, Elijah M. Topliff,* and *Batchelder & Faulkner,* for the plaintiffs.

*James F. Briggs* and *Oliver E. Branch,* for the defendants.

CHASE, J. Prior to March 14, 1894, the New Hampshire Trust Company had issued and sold debentures to the amount of $3,594,800, which were then outstanding; and had deposited with trustees notes · secured by mortgages of western real estate amounting to a sum slightly larger, to be held as security for their payment. In this way they had borrowed money at one rate of interest and loaned it at a higher rate, pledging the loans as security for the payment of the money borrowed. The object was to make a profit from an excess in the money received for interest over that paid for interest and expenses. The agreements creating the pledge provided in substance that the company should have the interest accruing upon the collaterals so long as they promptly paid interest upon the debentures and kept the collaterals equal in value to the amount of debentures outstanding. By this provision, the principal and interest of the collaterals were separated and distributed so long, at least, as an equality was maintained between the value of collaterals and the amount of debentures,— the principal of the collaterals being set apart as security for the principal of the debentures, and the income as security for the interest.

March 15, 1894, the company filed in this court a petition setting forth their inability to meet their obligations as they matured, and alleging that a readjustment of their debenture indebtedness as therein proposed would overcome such inability. They prayed for authority to issue new debentures in a specified form to an amount not exceeding the amount of the old ones, bearing a lower rate of interest, and to withdraw from the trustees the collaterals held by them and repledge the same with other trustees, to be appointed by the court, as security for the payment of the new debentures according to the provisions of an agreement proposed. A decree was made granting the prayer of the petition and appointing the plaintiffs trustees. Under this authority the company have taken up and cancelled nearly all of the old debentures and substituted new ones, and have transferred the collaterals from the former trustees to the plaintiffs. By the new debentures they promised to pay the payees or order the sums named in them on the first day of January, 1904, or sooner if the company saw fit, with interest semi-annually at the rate of four per cent per annum until October 1, 1897, and five per cent per annum after that date. Each debenture sets forth that it is one of a series, all of like tenor and equally and ratably secured by certain properties pledged with the trustees under the agreement with them, which is made a part of the contract; and there is indorsed upon each a certificate of this fact, signed by the trustees, and alleging that the holder is entitled to participate in the benefits secured by the trust agreement. The agreement with the trustees provides that the company shall deposit with them, as security for the payment of debentures certified by them, titles to real estate and notes secured by first mortgages of real estate (being a part of, or all, the securities pledged for the old debentures) and other securities that are satisfactory to the trustees, together equal in appraised value to the amount of debentures certified; and that the trustees shall have full control of these properties, including the collection of principal and interest, but " shall effect such collections and manage such properties through the medium of the officers, agents, and employees of the company, unless it shall appear that the interests of the trust property require that other agencies be employed."

There is no controversy concerning the legal effect of these contracts. The debentures are absolute promises of the company to pay specified sums of money, with interest, at specified times. The agreement with the trustees creates a pledge of the property described in it as security for the payment of the debentures. The intervention of trustees and the employment of the company as their agents are provisions for the care and management of the pledge, rendered necessary by the number of debenture holders and the character and location of the property

pledged and its incidents. The holders of ¡the debentures are the parties beneficially interested in the pledge,— the equitable pledgees. The property belongs to the company, subject to the pledge, and they will have the benefit of whatever is ultimately realized from it. The company, in executing their agency for the trustees, in fact manage their own property. A promise by the trustees to pay for services rendered under such circumstances does not arise by implication. In the absence of an express agreement, it would be inferred that such services were induced by selfish interests on the part of the company rather than by an expectation of payment by the trustees, or from the property in their possession.

But the company claim that the trust agreement authorizes them to retain from the money coming into their possession in the course of their agency sufficient sums to reimburse them, not only for interest paid upon debentures, but for taxes paid upon the pledged property and for expenses incurred in administering the trust, including the expenses attending their agency. To support the claim, they rely upon the following provision of section 5: "All collections of principal on mortgages, all sums realized on sales of any property then in this trust, all rents, income, and interest in excess of the amount required to pay the interest on the outstanding obligations, under this or former trusts, sums paid as taxes and actual expenses of administering this trust shall be paid over to the trustees from time to time, as the same is received." It is noticeable that the principal and income are here separately mentioned. This was unnecessary if they were to be treated as one. In such case, a general term covering both would have made the provision briefer and avoided ambiguity. The special mention of both tends to show that they were not to be treated alike. There is further evidence to the same effect in the grammatical construction of the sentence. The qualifying clause, beginning with the words "in excess," naturally qualifies the words immediately preceding it,— "rents, income, and interest,"—and not these words jointly with the more remote phrases, "collections of principal," and "sums realized on sales." To bring the latter under its influence they should have been joined to the former by the copulative "and," so that the sentence would read as follows: All collections of principal, all sums realized on sales of property, and all rents, income, and interest, in excess, etc.

But there is more satisfactory evidence of the intent attempted to be expressed by this language. The company, being insolvent, wished to make an arrangement with their creditors, not to close up their business and surrender their property to the creditors, but to render themselves solvent so that they could continue in business. This was to be accomplished by reducing

their interest charges from six to four and five per cent, thereby making a saving of over $70,000 a year during the first three years, and over $35,000 a year during the remainder of the time. The property previously pledged to the debenture holders was to be repledged. The pledgees were not to surrender any portion of their security. In the words of the defendants' argument, " the effect of the new agreement was substantially this: The two former trusts were discharged, the old debentures cancelled, a new series bearing a lower rate of interest issued in their place, and the securities lodged in the hands of the plaintiffs, with the intention that the business of the company in respect thereto should be conducted substantially as before." As has been seen, the old contracts in effect separated the principal and income of the collaterals and distributed them to the principal and interest of the debentures. No reason appears why the parties should not desire to have the same distribution by the new contract. It was a natural thing to do, considering the character of the business and the nature of the debt and collaterals. The principal of the debt was not absolutely due until 1904, while the interest became due at intervals of six months during the meantime. It does not appear when the principal and interest of the collaterals were payable, but it is safe to assume that the portion secured by mortgages became due at specified dates, and that the interest upon the same and the other income became due at the expiration of annual or semi-annual periods. The parties would naturally treat the recurring income of the collaterals as security for interest charges recurring in a similar way. In such case, if there was no stipulation to the contrary, the income for the time being would be released from the pledge upon payment of the corresponding interest, so that the company would have the use of it to meet their interest and expenses. Such was the effect of the old contracts; but in the new one it was stipulated that the excess of income above what was required to pay interest, taxes, and actual expenses should be paid to the trustees and be subject to the pledge. In other words, the net profits of the business were pledged to the debenture holders in addition to what had been pledged under the old contracts.

The last part of section 5 contains further evidence bearing upon this question. It reads as follows: " If any part of the income or interest is required to pay the expenses of administering this trust and taxes as aforesaid, the full amount of the same shall be paid over to said trustees before any dividend, either of profits or assets, shall be made or paid to the stockholders of said company." It is highly improbable that principal would have been omitted from this provision if it had been understood that any part of it might be used to pay expenses and taxes.

There certainly could be no reason for returning income that would not be equally strong for returning principal. It cannot be inferred that principal was lost sight of for the moment, because its income was specially mentioned. This evidence has much weight in favor of the position that no part of the principal was to be used to pay such charges. There is another significant omission in this provision. The amount to be paid the trustees is to equal the sums paid from income for taxes and expenses only,—it is not to include sums paid for interest. This tends to show that income was regarded as security for the payment of interest. The payment of interest released from the pledge an equal amount of income.

Section 4 provides in respect to the agency that " the trustees may allow the company to withdraw from their hands from time to time for collection, suit, or foreclosure, notes, mortgages, or other evidences of debt, . . . and all that is collected, realized, or acquired, by means of securities and evidences of debt thus withdrawn, shall be put back into and become again a part of the security under this trust." This language is sufficiently comprehensive to include both principal and income ; but when it is considered in connection with the provisions of section 5 before mentioned, it is plain that it refers to principal only. The two provisions together clearly express the intention that all sums realized from principal of collaterals should be put back into and become again a part of the security. Putting back what is realized from the principal, less sums paid for interest, taxes, and expenses, or less any part of such charges, would not fulfill the requirements of this provision.

Still another provision of the contract furnishes evidence to the same effect. By section 7 the company promised to pay the plaintiffs for their services and expenses, and gave them " a first lien upon the securities remaining in their hands " to insure such payment. The promise is explicit and unqualified. The pledge, except in its priority, resembles the pledge to the debenture holders. Neither the debenture holders nor the plaintiffs are required to look to the pledge in the first instance for their pay. They may seek it from other property of the company,— the former at the expiration of five months after a default (see section 6), and the latter at any time. Their position does not differ in this respect from that of an ordinary pledgee or mortgagee. The section further stipulates that the compensation and expenses thus provided for " shall be deemed to be a part of the expenses of administering this trust to be paid out of the collections realized from the trust property in accordance with the provisions of section numbered five." The effect of this is to allow the company to use for the time being income coming into their possession as agents of the plaintiffs to pay the plaintiffs'

compensation and expenses. It would be a superfluous provision were it not for the provisions of section 5, by which the net profits of the business are pledged to the debenture holders, and the company, before making a dividend to their stockholders, are required to pay the plaintiffs an amount equal to the sums they have appropriated from income for expenses and taxes. In view of the latter provision, it was prudent to define what should be included in expenses. Had it not been for this provision, payment of interest by the company as it became due would release the whole income from the pledge. The clause last quoted makes it clear that the plaintiffs' compensation is to be treated as a part of the expenses in adjusting the rights of the parties under section 5.

From a consideration of all the evidence, it appears that the parties intended to authorize the company to use so much of the income as was necessary to pay interest upon the debentures, taxes upon the property subject to the pledge, and actual expenses of caring for and managing such property, and to require them to pay the plaintiffs all collections of principal without diminution and all excess of income above the charges specified. If the income is not sufficient to meet these charges, the company must provide for the deficit, outside the pledge. Before making any dividends to their stockholders they must also reimburse the plaintiffs for all income used for the payment of taxes and expenses. If the plaintiffs manage the property and convert it into cash through other agencies than the company, they should appropriate the income collected to the payment of interest, taxes, and expenses, and if the same is not sufficient, should look to the company to make up the deficiency. In other words, the employment of an agency other than the company has no bearing at all upon the question where the expense shall fall.

*Case discharged.*

All concurred.